**UNITED STATES of America**

v.

**Ted Russell PERKINS, II, Defendant.**

**No. 4:CR–94–0213.**

United States District Court,
M.D. Pennsylvania.

Jan. 5, 1995.

George J. Rocktashel, Asst. U.S. Atty., Lewisburg, PA, for U.S.

Joseph M. Devecka, State College, PA, for defendant.

### *MEMORANDUM*

McCLURE, District Judge.

### *BACKGROUND:*

On September 20, 1994, a grand jury sitting in the Middle District of Pennsylvania returned a one-count indictment charging defendant Ted Russell Perkins II with distributing and possession with intent to distribute a controlled substance.

Before the court is defendant's motion to suppress evidence seized at a bus station by members of the Pennsylvania State Police. Defendant contends that the seizure violated his rights under the Fourth Amendment. A hearing on the motion commenced December 29, 1994, and concluded January 3, 1995, after jury selection. Presentation of the case to the jury is scheduled to begin January 12, 1995.

*DISCUSSION:*

## I. STANDARD UNDER THE FOURTH AMENDMENT: ABANDONMENT

■ In order to challenge evidence as the fruit of an unlawful search, the defendant must have a constitutionally protected, reasonable expectation of privacy. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The inquiry is a two-pronged, "subjective-objective" test: (1) Has the defendant manifested a subjective expectation of privacy in the object of the challenged search? (2) Is the defendant's expectation one which society is willing to recognize as reasonable? *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811–12, 90 L.Ed.2d 210 (1986) (citing *Katz, supra* ).

■ The Fourth Amendment does not protect abandoned property. *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 *reh'g denied,* 362 U.S. 984, 80 S.Ct. 1056, 4 L.Ed.2d 1019 (1960). The test for abandonment is the obverse of the objective prong of the reasonable expectation test:

> The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. This determination is to be made by objective standards. An expectation of privacy is a question of intent which "may be inferred from the words spoken, acts done, and other objective facts."

*United States v. Rem,* 984 F.2d 806, 810 (7th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). *See also United States v. Lee,* 916 F.2d 814, 818 (2d Cir.1990) ("When a person voluntarily abandons property ... he forfeits any reasonable expectation of privacy that he might have had in the property."). The objective facts known to law enforcement officers at the time of the search determine whether there is a reasonable continued expectation of privacy, i.e., whether the property has been abandoned. *Rem,* 984 F.2d at 811.

■ Abandonment must be voluntary in fact; it is not voluntary if it is the result of a preceding Fourth Amendment violation or other illegal police conduct. *United States v.*

*Ward,* 961 F.2d 1526, 1535 (10th Cir.1992). In *Ward,* the Tenth Circuit held that the abandonment was not voluntary because of a *per se* rule that police presence in a confined area, such as a train roomette, is coercive. *Ward* has been overruled to this extent, since the Supreme Court held in *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), that no such *per se* rule exists, and established a totality of the circumstances test:

> ... [N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required.
>
> . . .
>
> We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

501 U.S. at 429, 111 S.Ct. at 2383, 115 L.Ed.2d at 400, 401–402.

Although the Supreme Court in *Bostick* was reviewing the voluntariness of consent, 115 L.Ed.2d at 400, while the Tenth Circuit in *Ward* was reviewing the voluntariness of abandonment, the Tenth Circuit held that the same test applies in each instance. 961 F.2d at 1535. This part of the holding of *Ward* is unaffected by *Bostick. See United States v. Little,* 18 F.3d 1499, 1503–1504 and 1504 n. 5 (10th Cir.1994).

■ There are, then, two separate, objective tests. As to abandonment, the test is whether a reasonable person with knowledge of the facts and circumstances known to the police officer at the time of the purported abandonment would believe that the owner had relinquished all interest in the privacy of the property. As to whether the abandonment was voluntary, the test is whether the police conduct was so coercive that a reasonable person would believe that he had no

choice but to act as he did, i.e. to abandon the property.

## II.  FINDINGS OF FACT

1.  The Bestway Truckstop is located near the Milesburg exit (Exit 23) of Interstate Highway 80 (I–80), at the intersection of Pennsylvania Routes 150 and 220, about one mile north of Milesburg.

2.  The Bestway Truckstop is used by Greyhound buses travelling on I–80, though its primary use is by truck drivers.

3.  The Bestway Truckstop consists of a restaurant, game room, convenience store, motel rooms, and shower facilities.

4.  Also in the vicinity of the Bestway Truckstop is a Days Inn and the Buckhorn stop.

5.  Other than those facilities, the Bestway Truckstop is isolated, being surrounded by open fields, corn fields, and a wooded area.

6.  On September 1, 1994, a Greyhound bus bound from New York City, New York, to Cleveland, Ohio, made a scheduled stop at the Bestway Truckstop.

7.  On September 1, 1994, troopers of the Pennsylvania State Police, Bureau of Drug Law Enforcement, Tactical Narcotics Team, were engaged in narcotics interdiction efforts at the Bestway Truckstop.

8.  The bus bound for Cleveland arrived at the Bestway Truckstop at approximately 9:45 p.m.

9.  When a bus stops at the Bestway Truckstop, the bus driver and passengers generally leave the bus to use the restaurant, convenience store, restrooms, or other facilities at the Truckstop.

10.  Members of the Tactical Narcotics Team routinely observe the passengers as they leave the bus for the purpose of observing their reaction to the presence of troopers, to see which passengers have bags and where the bags are placed, etc.

11.  When engaged in drug interdiction efforts, members of the Tactical Narcotics Team display some emblem of their authority and position, such as hats, jackets, or badges worn on a chain around the neck.

12.  On September 1, 1994, defendant Ted Russell Perkins II was a passenger on the bus which stopped at the Bestway Truckstop at 9:45 p.m.

13.  Perkins had boarded the bus at Newark, New Jersey.

14.  Both New York City and Newark are known to the Tactical Narcotics Team as source cities for the flow of narcotics through Pennsylvania to such cities as Cleveland or Chicago.

15.  When the bus stopped at the Bestway Truckstop, it was positioned near the entrance to the Truckstop, about 50 feet from the door.

16.  When the bus stopped at the Bestway Truckstop, Trooper Ernest W. Barber of the Tactical Narcotics Team positioned himself approximately 10 to 15 feet from the bus door.

17.  Two other troopers assigned to the Tactical Narcotics Team were positioned in the same area.

18.  Trooper Barber concentrated on watching the reactions of the passengers as they became aware of the presence of the Tactical Narcotics Team, who were identifiable through their apparel or badges, and by the marked canine unit which was parked nearby.

19.  The other troopers watched the passengers as they left the bus, as well as those still on the bus to see what might be done with baggage.

20.  Defendant was somewhere in the middle of the group of passengers exiting the bus.

21.  Upon leaving the bus, defendant appeared to Trooper Barber to be tired, sleepy, and to be stretching.

22.  After leaving the bus and walking approximately 10 feet, defendant appeared to notice the troopers for the first time, and his face showed surprise and concern.

23.  Because of defendant's reaction to the presence of the troopers, Trooper Barber

took special notice of defendant and tried to keep defendant in sight.

24. Approximately 5 to 10 minutes after the passengers departed from the bus, a dog trained to detect the presence of narcotics was brought onto the bus, and was walked at least part of the way down the aisle of the bus.

25. At the time the dog was on the bus, only one passenger was on the bus.

26. At the time the dog was on the bus, the other passengers had gone to the Bestway Truckstop building, though some stayed near the front of the building to watch the troopers.

27. Defendant stayed outside of the building, pacing back and forth in front of the building, in what appeared to Trooper Barber to be a nervous manner.

28. Defendant watched the troopers who were in the vicinity of the bus, and at times looked toward the wooded area near the Truckstop.

29. In addition to walking the dog onto the bus, the troopers checked the common areas of the bus, and also looked over the tickets held by the bus driver.

30. One of the troopers, Trooper James Sattazhan, checked the tickets and found that one had been purchased at 6:04 p.m. on September 1, 1994, for a trip that was scheduled to begin at 6:00 p.m. on the same date.

31. Trooper Barber's training and experience have taught him that the manner of purchase of tickets for both bus and airplane trips may be an indicator of narcotics trafficking.

32. None of the tickets examined by the troopers showed a trip that ended in Pennsylvania, so that all of the passengers were going to points west of Pennsylvania.

33. During the time that the dog was taken onto the bus and the tickets and common areas checked by the troopers, Trooper Barber lost track of defendant.

34. Since defendant's conduct had aroused Trooper Barber's curiosity concerning defendant, Trooper Barber wanted to locate and watch defendant.

35. Trooper Barber conducted a search for defendant, looking in the restaurant, store, game room, rest room, basement, and several hallways of the Bestway Truckstop.

36. Trooper Barber did not look in the Buckhorn Truckstop, the Days Inn, or the parking area behind the Bestway Truckstop because none of those areas is frequented by passengers of the Greyhound buses which stop at the Bestway Truckstop.

37. Trooper Barber was unable to locate defendant in any of the areas in which a passenger on a Greyhound bus normally would be found in the Bestway Truckstop.

38. The members of the Tactical Narcotics Team returned to the bus when the time came for passengers to return to the bus.

39. An announcement over the public address system informed passengers inside the Bestway Truckstop building that the bus was preparing to depart.

40. When the troopers returned to the bus, they intended to ask passengers for consent to search baggage.

41. It is Trooper Barber's experience that nearly every passenger who is asked gives consent to a search of his or her baggage.

42. Had defendant returned to the bus, Trooper Barber fully intended to interview him for the purpose of obtaining consent to search his baggage.

43. At no time prior to its departure did defendant return to the bus.

44. While on the bus, the troopers found an unattended bag lying on a seat on the right side of the bus about one-third of the way back into the bus.

45. The unattended bag was not claimed by any of the people seated in the vicinity of the seat on which the bag was located.

46. The bus driver told the troopers that a person matching the description of defendant had carried the bag onto the bus at Newark.

47. The bus driver took notice of the man carrying the bag onto the bus because he had held up the bus for several minutes past its departure time at Newark. *See* ¶ 30.

48. Passengers on the bus also provided a description of the man to whom the bag belonged which matched the description of defendant.

49. The general description given by both the bus driver and the passengers was that of a tall, thin, black man wearing a black running suit.

50. The description given by the bus driver and the passengers matched defendant when seen by Trooper Barber as defendant exited the bus and when defendant was pacing the walk in front of the Bestway Truckstop.

51. Trooper Barber held the bag up in front of the passengers who returned to the bus and asked whether anyone on the bus owned the bag.

52. No passenger on the bus claimed ownership of the bag.

53. The troopers removed the unattended bag from the bus and examined it, but found no labels or any other form of identification on the bag.

54. The troopers opened the bag and found three bricks of a white, powdery substance which field-tested positive for cocaine.

55. For purposes of the motion to suppress, defendant admits to possession of the bag. Motion to Suppress at 5 ¶ 24.

56. For purposes of the motion to suppress, defendant admits to being the holder of a valid ticket as a passenger on the bus.

### III. SEARCH OF THE BUS

■ Although the point was not argued in his brief, defendant contended during the suppression hearing that the search of the bus was itself a violation of defendant's Fourth Amendment rights. This argument lacks merit: a single passenger on a bus does not have a privacy interest in the entire bus which is recognizable under the Fourth Amendment. The driver and bus company employees come and go, as do other passengers. A single passenger on a bus has no more interest in the privacy of the bus than a non-owner passenger in an automobile. *See generally Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). *See also Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (boarding of bus by police to question passengers and to seek consent to search of baggage is not a *per se* violation of the Fourth Amendment). The boarding of the bus by the Pennsylvania State Police at the Bestway Truckstop did not violate any Fourth Amendment rights on the part of defendant.

### IV. ABANDONMENT

■ With regard to the issue of abandonment of the bag, the sole question is whether, based upon the facts and circumstances known to the law enforcement officers at the time of the search of the bag, defendant intended to retain an interest in the bag. The facts and circumstances known to the Tactical Narcotics Team when they removed the bag from the bus may be summarized as follows:

(1) Defendant was on the bus when it stopped at the Bestway Truckstop, and debarked with the rest of the passengers.

(2) Upon seeing the police and the canine unit, defendant showed signs of nervousness and agitation (acting in what counsel for the government termed a "furtive manner" during the time that the dog was taken onto the bus, a description consistent with the testimony presented).

(3) Defendant stayed near the bus to watch the activities of the police, also scanning the wooded area near the Truckstop.

(4) Defendant disappeared from view during the initial search of the bus, when the dog was brought to the bus.

(5) Defendant could not be located in the Truckstop after this initial search was completed.

(6) Defendant did not return to the bus when it reboarded, and was not present when the second search was conducted, when the bus driver and passengers were interviewed.

(7) Defendant was travelling from Newark to Cleveland, and had bought his ticket four minutes after the scheduled departure time of the bus.

(8) Some passengers and the bus driver identified defendant as the owner of the bag; no other passenger claimed the bag.

(9) No passengers were scheduled to end their trip at the Bestway Truckstop, or even during the rest of the route through Pennsylvania.

Succinctly stated, defendant became nervous when he saw the police, remained agitated while the police were on the bus, disappeared, could not be located when the bus reboarded, and did not return at any time prior to the departure of the bus. These circumstances certainly would lead a reasonable person to conclude that defendant had abandoned his bag.

Although not argued by defendant, a contention could be made that a passenger might simply have forgotten to pick up his bag. The circumstances in this case, however, do not lead to such a conclusion. The Bestway Truckstop was not a final destination for any passenger on the bus. Nor was the Truckstop a normal destination: it was simply a resting point in the middle of a long trip, located in a relatively remote, rural area of central Pennsylvania. Nor would such an area be a reasonable place for a passenger to simply wander off: there was nothing in the area to arouse particular interest.

Counsel for defendant also pointed out that the officers at the Truckstop did not have probable cause to arrest defendant until after they opened the bag. We agree. However, the officers did not engage in any activity for which probable cause was necessary. They searched a vehicle engaged in public transportation, an activity which is constitutionally permissible. *Bostick, supra.* They entered the areas of the Truckstop which are accessible to the public. They then re-entered the bus and interviewed the passengers and bus driver. None of these activities constitutes an infringement of any interest protected by the Fourth Amendment, and no probable cause need be established before law enforcement officers may engage in any of these activities.

## V. INVOLUNTARY ABANDONMENT

■ We have concluded, based upon the foregoing, that defendant abandoned his bag on the bus. Defendant argues, however, that the conduct of the troopers was so coercive as to have rendered his abandonment of the bag involuntary. To use defendant's terminology, he was "harassed" into abandoning the bag.

According to defendant, when the troopers searched the bus with the dog, then left the bus and entered the terminal, a reasonable person would conclude that they had found something. Since they had not found anything, their conduct must have been intended to convey this impression for the purpose of causing defendant to avoid returning to the bus.

Actually, law enforcement officers who search a bus eventually will leave the bus, whether they have found anything or not.

Moreover, there is no support for the contention that the officers would go inside the terminal only if some incriminating object had been found on the bus. There can be any number of reasons for officers to enter the terminal: to talk to a bus driver; to wait for the next bus to come along; as in this case, to wait for the passengers to reboard the bus, so that they can seek permission to search bags; to use the facilities themselves; etc. It simply is not reasonable to conclude that a police officer who leaves a bus and enters a bus terminal necessarily has found incriminating evidence on the bus.

It should also be added that the attention of the troopers had not centered on the bag at that point in time. There is no indication that they were any more aware of defendant's bag than of any other bag on the bus. In fact, it was only after the other passengers had reboarded the bus that attention focussed on the unattended bag. In no way, then, can the troopers have intended to "harass" defendant into abandoning his bag. Nor, as discussed above, would a reasonable person have perceived the conduct of the troopers as harassment.

We reiterate that the standard is objective: Would a reasonable person have felt that he or she had no choice but to abandon the bag? A reasonable person would not feel the need to abandon a bag simply because law en-

forcement officers are present. Defendant's argument would substitute this objective standard with a "reasonable drug courier standard": Would a reasonable person with three kilos of cocaine in his or her bag have felt that he or she had no choice but to abandon the bag? Obviously, the conclusion would be different based upon this standard, but this standard does not apply.

This is not an instance in which, for example, a police officer attempted to make a warrantless arrest without probable cause and a chase of the suspect ensued. Obviously, if such a suspect dropped some sort of object during the chase, even intentionally, the object would be inadmissible due to the earlier Fourth Amendment violation. Here, however, there was no earlier violation, and defendant made a reasoned choice to abandon his bag, not due to any coercion, but due to the chance that he might be caught with the cocaine.

## VI. CONCLUSION

The conduct of the members of the Tactical Narcotics Team at the Bestway Truckstop was reasonable within the meaning of the Fourth Amendment. The areas searched initially were not subject to a cognizable privacy interest on the part of defendant. Based upon the facts and circumstances known to the troopers at the time that they reboarded the bus and interviewed the bus driver and other passengers, the troopers reasonably concluded that defendant had abandoned his bag. There was no coercive conduct on the part of the troopers which caused defendant to abandon his bag.

For all of these reasons, defendant's motion to suppress will be denied. An appropriate order shall issue.