**UNITED STATES of America,**

v.

**Ibrahim Hamud FULANI.**

**No. 3:CR–02–049.**

United States District Court,
M.D. Pennsylvania.

Aug. 20, 2003.

 

Ibrahim Hamud Fulani, Scranton, PA, pro se.

George J. Rocktashel, Williamsport, PA, for Plaintiff.

## MEMORANDUM

VANASKIE, Chief Judge.

Presently before the Court is Defendant Ibrahim Hamud Fulani's motion to suppress evidence seized as a result of a warrantless and non-consensual search of luggage during a drug interdiction investigation at the Delaware Water Gap bus terminal in Monroe County, Pennsylvania. Agents of the Pennsylvania Bureau of Narcotics Investigation ("BNI") searched the bag without a warrant under the theory that it had been abandoned. The evidence presented at the suppression hearing held on June 20, 2003, however, belies the Government's theory of abandonment. Specifically, the BNI agents could not infer abandonment from Fulani's silence when they asked whether any bus passenger claimed ownership of the suitcase because Fulani was not obligated to respond to the inquiry or otherwise cooperate with the agents. Moreover, the BNI agents could not infer abandonment because the luggage contained an identification tag bearing Fulani's name, manifesting both his claim of ownership and expectation of privacy in the contents of the suitcase. Therefore, the suppression motion will be granted.

## BACKGROUND [1]

On February 21, 2002, at approximately 3:15 p.m., Greyhound Lines Bus No. 6466, en route from New York City to San Francisco, made a scheduled stop in Monroe County, Pennsylvania. With the permission of the driver, BNI Agents Ronald Paret and Jeffrey P. Aster boarded the

Patrick A. Casey, Scranton, PA, for Defendant.

---

1. Except as otherwise indicated, this section sets forth the Court's findings of fact.

bus. Both agents had badges visible on neck chains and carried concealed weapons.

Agent Aster boarded the bus first and went directly to the lavatory area in the rear of the bus. Agent Paret remained at the front of the bus to cover Aster as he proceeded to the rear of the bus. (Suppression Hearing Tr. at 70.) Paret made a general announcement on the public address system identifying the agents and stating that their purpose on the bus was to investigate drug trafficking. In addition, the passengers were advised that their "cooperation was appreciated, but not required." (*Id.* at 8.)

Agent Paret spoke briefly with every passenger, inquiring as to their destination, inspecting their tickets, and asking each passenger about their carry-on or baggage that they may have on their trip. (*Id.*) During this time, Paret and Aster positioned themselves on the bus so as not to block the aisle, and the bus door remained open so that the passengers could freely exit or enter the bus.

Fulani, a passenger on the bus, is a Nigerian national who speaks Yoruba. (Def. Reply Brief, Dkt. Entry 34, at 6.)[2] Agent Paret approached Fulani, who was approximately one-third of the way towards the rear of the bus, and looked at his bus ticket that read "Fulani/Ibrahim" on it. He then asked Fulani whether or not he had any luggage, and Fulani indicated that he had a plastic bag near his feet. Agent Paret then made reference to the overhead compartment and asked if that was the only bag he claimed. Fulani gave an oral indication that the plastic bag near his feet was his only bag. (Suppression Hearing Tr. at 11.)

After speaking with every passenger, one "Shindun" brand bag, black, with wheels and a pull handle, remained unclaimed by any passenger. The unclaimed bag was located on the driver's side, in the overhead compartment, almost directly above Fulani's seat. (*Id.* at 12.) Paret stayed at the front of the bus while Aster went back and physically retrieved the bag from the overhead compartment. (*Id.*) From that location, which was near where Fulani was seated, Aster held the bag up over his head and asked the passengers if the bag belonged to anyone. (*Id.* at 12–13.) After waiting about 15 to 20 seconds and hearing no affirmative response, Aster removed the bag from the bus and met with Agent Paret.

Attached to the side handle of the bag was a Greyhound identification tag bearing Fulani's name in handwriting. (*Id.* at 78.) Aster testified that, "when I got off the bus and closely inspected the bag with Agent Paret, we saw the tag, and we said, 'Oh, there is a name on it.'" (*Id.* at 78.) The agents could not read what the tag said and had to flip the tag over to see that there was handwriting on the tag with Fulani's name on it. (*Id.*) Aster then asked Paret to let him take the bag back on the bus and try one more time to see if they could identify the owner of the bag before they searched it. (*Id.* at 80.) Aster re-boarded the bus and, this time from the front of the bus, made a second inquiry as to the ownership of the bag. (*Id.*) Again, there was no affirmative response. Aster exited the bus with the bag and met Paret in front of the bus, at which time the bag was opened and searched. Inside the bag the agents found five plastic bags suspected to contain heroin. The agents also found a Nigerian passport bearing Fulani's

---

**2.** It is Fulani's contention that he did not understand the agents' questioning. However, at the suppression hearing, Fulani's counsel noted that Fulani does speak English, and an interpreter was not needed for the proceeding. (*Id.* at 3, ln. 13–24.)

name and photograph, as well as a receipt for an airline ticket bearing Fulani's name.[3]

Following the completion of the search, Paret placed the bag in his car, and he and Aster re-boarded the bus in an attempt to find the owner of the bag. (*Id.* at 15.) After speaking with two other passengers seated across the aisle from Fulani and examining their bus tickets, Paret requested permission to examine Fulani's ticket. Fulani was seated directly below where the unclaimed bag had been located. Fulani produced a one-way ticket from New York to Chicago, with the name "Fulani Ibrahim" on it. He was then placed under arrest and removed from the bus at approximately 3:25 p.m.

Fulani was indicted for possession of a controlled substance with intent to sell, distribute or dispense, in violation of 21 U.S.C. § 841(a). Briefing on his suppression motion was completed on March 12, 2003. Following the evidentiary hearing conducted on June 20, 2003, counsel presented argument. The motion is ripe for disposition.

## DISCUSSION

The Fourth Amendment to the United States Constitution reads as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing that place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. A traveler's personal luggage is clearly an "effect" protected by the amendment. *See United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)("a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment").

■ When a search is made without a warrant the burden shifts to the government to establish by a preponderance of the evidence that the warrantless search falls within one of the exceptions to the warrant requirement. *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir.), *cert. denied*, 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992); *see also United States v. Most*, 876 F.2d 191, 193 (D.C.Cir.1989). "If the government could not make this showing, then the exclusionary rule would generally bar the admission of the illegally obtained evidence." *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Herrold*, 962 F.2d at 1137.

The Fourth Amendment has been construed to protect reasonable expectations of privacy. As articulated in *Bond v. United States*, 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000):

> "Fourth Amendment analysis embraces two questions. First, we ask whether the individual, by his conduct, has exhib-

---

**3.** There is a discrepancy between the accounts of events resulting in the search of the bag. According to Paret, before noticing the name tag, he opened the main compartment of the bag and found five bags of white powder believed to be heroin. In the outside pocket, he found an airplane ticket with Fulani's name on it. (*Id.* at 14.) According to Paret, it was only after he searched the bag that he noticed a Greyhound identification tag on the outside of the bag. Paret said the tag was on one of the upper handles, and not on the side handle, where Aster said it was located. (*Id.*) I have found Agent Aster's testimony to be more credible, and therefore relied upon it in concluding that the agents were aware of the name tag on the bag before it was searched. This credibility determination is based on the fact that Aster seemed to have a better recollection of the bus interdiction, provided more detailed testimony, and was not as hesitant or uncertain as was Paret.

ited an actual expectation of privacy; that is, whether he has shown that 'he [sought] to preserve [something] as private.' . . . Second, we inquire whether the individual's expectation of privacy is 'one that society is prepared to recognize as reasonable.' "

██ Accordingly, the Fourth Amendment does not protect abandoned property because there can be no expectation of privacy when one has relinquished any possessory or ownership claim to such property. *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). "[A]bandonment depends largely on the possessor's intent, and the party relying on it must establish the necessary state of mind by clear and unequivocal evidence." *United States v. Moody,* 485 F.2d 531, 534 (3rd Cir.1973) (citations omitted). As explained in *United States v. Perkins,* 871 F.Supp. 801, 803 (M.D.Pa.1995), *aff'd,* 91 F.3d 127 (3d Cir.1996):

> The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. This determination is to be made by objective standards. An expectation of privacy is a question of intent which "may be inferred from the words spoken, acts done, and other objective facts."

For purposes of determining abandonment, the court must examine the objective facts as the agents encountered them at the time of the search. *Id.*

██ The Government asserts that the agents were justified in concluding that Fulani abandoned any expectation of privacy in the bag. The Government claims that when the agents initially asked Fulani if he had any baggage, he only claimed ownership of the plastic bag at his feet, and denied having any other luggage. (Suppression Hearing Tr. at 11.) When the agents displayed the unclaimed bag to all the passengers, none of them, including Fulani, claimed ownership of it.[4] The testifying agents concluded that the bag was abandoned because all passengers had cooperated and no one claimed that the baggage in question was in his or her possession. In other words, the agents inferred that silence in response to the direct question of whether the bag belonged to any passenger was equivalent to a disclaimer of ownership or possession.

The Government's position—silence following initial cooperation supports a reasonable inference of abandonment—has been rejected by a number of courts in similar circumstances. For example, in *United States v. Lopez,* No. CR–98–60143–AA, 1999 WL 494007 (D.Or. May 14, 1999), the defendant was a passenger on a bus where officers conducted a bus interdiction. The defendant was asked by an officer whether he had any luggage. He admitted to having a carry-on duffle bag and consented to a search. No drugs were found in the bag. He was then asked whether he had any other luggage in the storage compartment and he answered that he did not. The officers directed the passengers to identify their checked luggage and one piece of luggage with a claim ticket attached to it remained unclaimed. The officers then brought in a dog to sniff the unclaimed bag, and it alerted to the location where methamphet-

---

**4.** According to Agent Aster, Defendant was asked on three separate occasions whether he had any other luggage besides the plastic bag, and whether the unclaimed bag belonged to him. (*Id.* at 87–88.) The three separate occasions were: (1) when the agents first went through to talk to each passenger; (2) when Agent Aster picked the bag up and said does anybody own this or can anybody claim this bag; and (3) when Aster was in front of the bus and made the same announcement after seeing the identification tag on the luggage. *Id.*

amine was found. The court in *Lopez* noted that courts have held repeatedly that abandonment occurs when a defendant explicitly denies ownership of baggage or physically relinquishes control over the baggage. *Id.* at *16. The court held that defendant did not explicitly deny ownership of the bag; he simply did not claim the baggage when asked to do so by officers. The court found that silence was not tantamount to manifesting an intent to abandon his baggage. *Id.* Because the passengers were not required to consent to the officers' requests, the court found that the government could not construe what could be a refusal to comply as an abandonment. That the defendant had initially cooperated with the agents did not alter the conclusion. As the court observed, "[o]ne certainly could not draw an objective inference of abandonment from a person's failure to follow a precatory request." *Id.* at *17 (quoting *United States v. Garzon*, 119 F.3d 1446, 1450 (10th Cir. 1997)). *Accord, United States v. Cuevas-Ceja*, 58 F.Supp.2d 1175, 1190 (D.Or.1999).

Similarly, in *United States v. Sanders*, 719 F.2d 882 (6th Cir.1983), the court held that law enforcement officers could not infer abandonment simply because the defendant had not acknowledged ownership of the luggage. The agents in that case had testified that the defendant had been coy with them, saying that the bag may or may not belong to her. There was no evidence, however, that she explicitly disclaimed ownership of the luggage. The court found that under these circumstances the defendant continued to manifest a legitimate expectation of privacy in her luggage. *Id.* at 886.

▮ The issue presented in this case was thoroughly addressed by the Maryland Court of Appeals in *Stanberry v. State of Maryland*, 343 Md. 720, 684 A.2d 823 (1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1692, 137 L.Ed.2d 819 (1997). The

police in that case had conducted a drug interdiction investigation at a highway rest stop. They inferred abandonment of a suit bag found in the luggage rack of a bus from the silence of the passengers when they were asked if anyone owned the bag. After canvassing the decisional law of a number of federal and state jurisdictions, the court concluded that "when police are conducting a drug interdiction, when the interdiction protocol is the sole basis for the citizen inquiry and reasonable suspicion or probable cause is otherwise lacking, police may not infer abandonment from the owner's passive failure to claim property." *Id.* at 737, 684 A.2d at 832. In reaching this result, the unanimous high court considered significant the observation in *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), that "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." 343 Md. at 736, 684 A.2d at 831.

I find the comprehensive analysis and reasoning of the Maryland Court of Appeals to be persuasive. Fulani was not required to respond to any of the agents' questions. Thus, silence cannot support an inference that ownership was being disclaimed. Stated otherwise, silence is equally consistent with a legitimate refusal to cooperate. Moreover, the fact that Fulani had affirmatively claimed ownership of one bag and stated that he did not have any other bags cannot support a reasonable inference of abandonment in this case because he had placed his name tag on the luggage. It has been recognized that identifying a bag with one's name is an indicia of an expectation of privacy in the contents of the bag. *See Bond*, 529 U.S. at 338, 120 S.Ct. 1462. Once the agents in this case had observed the I.D. tag, they could not infer that the luggage was abandoned. Some one had asserted a claim to it, and

the agents had the ability to attempt to confirm ownership by, for example, asking whether there was a person named Fulani on the bus or asking to examine bus tickets, as they had earlier done. Had Fulani refused to produce his ticket or acknowledge his identity, the agents would not have been able to infer abandonment because he was not obligated to cooperate. In this case, however, Fulani had shown the agents his ticket that bore his name. Thus, the agents could have linked the bag to Fulani and requested his consent to a search. Had he denied permission, and absent a reasonable justification, the search of the bag could not have occurred.[5]

## CONCLUSION

"To equate a passive failure to claim potentially incriminating evidence with an affirmative abandonment of property would be to twist both logic and experience in a most uncomfortable knot." *State v. Joyner*, 66 Haw. 543, 669 P.2d 152, 153 (1983). This is especially true where the existence of an identification tag on the luggage and its placement on a luggage rack in close proximity to passengers indicate that a person is claiming an expectation of privacy in the contents of the bag. Accordingly, Fulani's motion to suppress will be granted. An appropriate Order follows.

### ORDER

**NOW, THIS 20th DAY OF AUGUST, 2003,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT**

1. Defendant's Motion to Suppress (Dkt. Entry 23) is **GRANTED.**

2. Evidence seized as a result of a search of defendant's luggage on February 21, 2002, may not be introduced at trial.

**5.** The Government has not cited any case holding that silence supports an inference of an intention to abandon. On the contrary, all the cases cited by the Government involved an explicit denial of ownership. *E.g., United States v. Lewis*, 921 F.2d 1294, 1302 (D.C.Cir.1990)(where record reflects defendant denied ownership of bag in overhead luggage rack, proper conclusion was that she abandoned the bag); *United States v. Rush*, 890 F.2d 45, 48 (7th Cir.1989)(defendant's denial of ownership of suitcase that he had been seen carrying through terminal was sufficient to preclude his assertion of any legitimate expectation of privacy in the bag); *United States v. Tolbert*, 692 F.2d 1041, 1044–45 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983)(defendant's insistence that she was traveling without luggage and her specific disclaimer of ownership of the bag required a finding that she abandoned any expectation of privacy in the bag); *United States v. Colbert*, 474 F.2d 174, 177 (5th Cir.1973)(facts of case showed that defendants abandoned briefcases when in response to police questions, they both disclaimed any interest in the briefcases and began to walk away from them).