564 A.2d 785

**Brandon FAULKNER**

v.

**STATE of Maryland.**

**No. 130, Sept. Term, 1988.**

Court of Appeals of Maryland.

Oct. 13, 1989.

Sherrie B. Glasser, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, ADKINS, BLACKWELL, JJ. and JAMES F. COUCH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

At issue here is the constitutionality of the warrantless search of an employee's workplace locker conducted with the police present by a private employer. We shall uphold the search as reasonable under all the circumstances, including particularly appellant's denial that the locker was being used by him.

Brandon Faulkner (Faulkner), the appellant, was employed by the Parks Sausage Company (Parks) at its plant in the Camden Industrial Park in Baltimore City. Parks's management had received complaints from employees about widespread use of drugs and alcohol on the job, particularly during the night shift. Parks engaged Security America, a company which had previously furnished guard service for Parks, to conduct a private investigation on those shifts. Marvin Jones (Jones) was one of the representatives of Security America with whom Parks's management primarily dealt. Security America placed an undercover operative at Parks in September 1987. The operative reported that drugs were both dealt and consumed during the second shift.

The Parks plant is a union shop where there are published work rules. One of the work rules, as orally described in the testimony, warned that the sale, trade or delivery of illegal drugs by an employee was cause for termination of employment and for referral of the offending employee to law enforcement authorities.

Parks's management determined to search the lockers of all of the approximately thirty employees on the second shift. After one or more postponements, the search was eventually scheduled for December 4, 1987, to begin at approximately 6:00 p.m. Reginald Haysbert (Haysbert), the Vice President for Human Resources of Parks, was to participate in the search. Haysbert asked Jones to arrange to have Baltimore City police officers present during the search. Safety concerns were at least one reason for this request inasmuch as management expected to find some narcotics and possibly some firearms. Haysbert also asked Jones to have a pair of bolt cutters available in the event an employee refused to open a locker which management wanted to search.

Pursuant to the request from Parks, Officer Irvin Bradley (Bradley) and five other Baltimore City police officers from the Southern District were present at the Parks plant when the search began. They also brought a pair of bolt cutters which someone at Parks had requested and which the Southern District officers had obtained from "CP–12." Haysbert, Jones, a Mr. Johnson who was Parks's production manager, and a union shop steward participated in the search of the men's locker room where at least some of the police officers, including Bradley, were standing by. Management asked the employees, one at a time, to come to the locker room and to open their lockers. One of the first male employees asked to come to that locker room was Faulkner.

Lockers at Parks are used by the employees both to keep personal items and to store company items. Parks has more lockers available than there are employees. Each employee is permitted to select the locker which that em-

ployee will use, but it is not company policy to permit an employee to use more than one locker.

When Faulkner came to the locker room he pointed to a locker in the second row from the door as being his and unlocked it. Johnson searched the locker and found nothing indicating a violation of any company rule. According to Haysbert, "[a]cross from" the locker which Johnson first searched was another locker with Faulkner's name on it. Faulkner said that that was not his locker. Haysbert testified that Faulkner said "[h]e didn't have knowledge of the locker." Thereupon, Haysbert, utilizing the bolt cutters, cut the lock on the second locker.[1]

In the locker Haysbert observed a man's jacket. In a pocket of the jacket Haysbert found a box. In the box was a used hypodermic syringe with needle. Haysbert showed the hypodermic to the police officers and backed away. Officer Bradley took the hypodermic and placed Faulkner under arrest. Bradley then searched the locker and found, *inter alia,* a plastic ziplock baggie containing a white powder which was later chemically analyzed to be cocaine.

After Faulkner had been arrested, but before he had been removed from the premises, Faulkner told the police that he did not want anything to be missing from the locker on which the lock had been cut. The police allowed Faulkner to turn the jacket over to someone for safekeeping.

Four other employees of Parks were also arrested during the search of lockers that night. All of those who were arrested were suspended from employment pending a disciplinary hearing in the grievance procedure. Faulkner's suspension was continued after his disciplinary hearing.

The State charged Faulkner with possession of cocaine and of paraphernalia, and Faulkner moved in the Circuit Court for Baltimore City to suppress the items seized from

---

1. Haysbert also testified that, if Faulkner had acknowledged that the locker was Faulkner's, Haysbert would have asked Faulkner to open it and Haysbert would not have cut the lock to open it.

the locker. A suppression hearing was held at which only Haysbert and Bradley testified. Faulkner argued that there was sufficient participation by the police in the search to make the fourth amendment applicable. The State, in opposition, raised three points: (1) Faulkner's motion was not timely; (2) Faulkner had no standing to claim a constitutional violation because he disclaimed any interest in the locker; and (3) the initial search by Haysbert in the second locker bearing Faulkner's name did not involve state action while the further search by the police in that locker was incident to a valid arrest. The circuit court applied the third of the State's arguments, denied the motion to suppress, and did not find it necessary to rule on the other two grounds advanced by the State.

Faulkner was convicted after a plea of not guilty on an agreed statement of facts and appealed to the Court of Special Appeals. We issued the writ of certiorari on our own motion prior to consideration of the case by the intermediate appellate court.

In his appellate brief in chief Faulkner exclusively argued the state action issue. The State's brief advanced its rebuttal to Faulkner's arguments in chief, and, in the event that the State did not prevail on the merits of the state action issue, the State urged that this case be remanded for determinations by the trial court on the other issues raised by the State at the suppression hearing. In his reply brief Faulkner points out, correctly in our view, that "there is no dispute as to the facts which premised the question of standing," Appellant's Reply Brief at 6, and that the issue "can readily be determined on the record." *Id.* at 7. Faulkner's reply brief then argues, for the reasons discussed below, that he has "standing" to claim a fourth amendment violation despite his denial that the subject locker was his.

Faulkner's argument begins by recognizing that his standing turns on whether he had a reasonable expectation of privacy in the locker which was forcibly entered. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Faulkner then turns to the opinion by Judge Moy-

lan for the Court of Special Appeals in *Ruffin v. State,* 77 Md.App. 93, 549 A.2d 411 (1988), holding that a thief had no standing to claim that a car stolen by him had been illegally searched. *Ruffin* distinguishes between fourth amendment applicability and fourth amendment satisfaction. *Id.* at 100, 549 A.2d at 414. It classifies standing to object as an instance of fourth amendment applicability. *Id.* at 102, 549 A.2d at 415. In that context *Ruffin* states:

> "When we shift issues from that of Fourth Amendment satisfaction to that of Fourth Amendment applicability, our criteria for measuring change dramatically. The concern shifts from the merits of litigation to the entitlement to litigate. The focus shifts from the subjective viewpoint of the policeman to the objective appraisal of the trial judge. The timeframe shifts from the moment of search or seizure to the moment of the suppression ruling. The object of measurement shifts from reasonable appearances to historic reality. What finally matters shifts from what the policeman reasonably believed out on the street to what the suppression hearing judge ultimately knows in the courtroom."

*Id.* Seizing on this approach, Faulkner submits that at the time of the suppression hearing in the instant case it was undisputed that Faulkner's belongings (those possessed legally as well as illegally) were in the locker. Consequently, says Faulkner, he enjoyed a reasonable expectation of privacy in the locker, had standing to object, and the State's standing argument lacks merit.

■ This argument attempts to isolate the relevance of a reasonable expectation of privacy solely to standing when the concept is relevant as well to the reasonableness of a search. This was made plain in *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), where Rawlings, anticipating an imminent search of his person by the police, dumped thousands of dollars worth of illegal drugs into the purse of a woman whom he had known for only a few days. The lower courts concluded that Rawlings had

no legitimate expectation of privacy in the purse, a conclusion with which the Supreme Court agreed. It explained:

"Had [Rawlings] placed his drugs in plain view, he would still have owned them, but he could not claim any legitimate expectation of privacy. Prior to *Rakas*, [Rawlings] might have been given 'standing' in such a case to challenge a 'search' that netted those drugs but probably would have lost his claim on the merits. After *Rakas*, the two inquiries merge into one: whether governmental officials violated any legitimate expectation of privacy held by [Rawlings]."

448 U.S. at 106, 100 S.Ct. at 2562, 65 L.Ed.2d at 642. Thus, even if we assume that Faulkner's reasonable expectation of privacy for standing purposes is to be determined as of the time of the suppression hearing, Faulkner's privacy interest, *vel non*, as it bears on the reasonableness of the search for purposes of determining whether the fourth amendment is satisfied, is determined as of the time of the search. *See Ruffin*, 77 Md.App. at 101–02 and n. 2, 549 A.2d at 415 and n. 2.

Consequently, we may decide this case within the following framework. First, the facts are undisputed so that we are not limited to the ground of decision relied upon by the circuit court. We may base our independent constitutional review on any ground plainly appearing from the record. Secondly, we shall assume, *arguendo*, that the degree of participation by the police in the opening and initial search of the locker was sufficient to constitute state action. Third, we shall assume, *arguendo*, that Faulkner had standing. Nevertheless the search was a reasonable one under the circumstances.

The search was on the employer's premises where the police were present at the employer's invitation. The lockers were the property of Parks. We shall assume that the employees respectively owned the locks. The lockers were used to store company as well as personal items. Parks had a reasonable basis for believing that drugs and alcohol were being used on the second shift, in violation of company

rules, based on the report of the undercover investigator which confirmed complaints from employees. There is no evidence that Parks or the police had any information connecting Faulkner in particular to the drug activity on the premises.

Further, the record compels the inference that, under the rules of the workplace, Parks reserved the right to conduct a general search of lockers, at least when there was a reasonable basis for believing that drugs and alcohol were being used by employees on a particular shift. This clearly appears from the direct evidence that a shop steward accompanied management in the search of the men's lockers and that another shop steward was present to observe the apparently simultaneous search of the women's lockers. Haysbert testified that a shop steward "had to be present for the locker search according to our procedures." There is no evidence that Faulkner, any shop steward, or any other employee objected to management's request to open any locker. Parks, according to Haysbert, "cut[s] off locks periodically when we have to clean lockers on a regular schedule," and Parks "cut[s] off lock[s] when we need to open the—when no one is around to open it."

Thus, from Faulkner's standpoint, he had only a minimal, if any, expectation of privacy in the second locker. He could not prevent management from entering the locker. His choice was to acknowledge that he was using the locker, unlock it and thereby preserve the lock, or deny that he was using it and have the lock cut. From the standpoint of management and the police, Faulkner's denial that the second locker was being used by him was consistent with the company policy under which an employee could use but one locker, and Faulkner had already identified one locker as his. Under all of these circumstances, including particularly Faulkner's disclaimer of any expectation of privacy in the second locker, Haysbert acted reasonably in entering the second locker, even if there were state action.

Abandonment was similarly a significant factor in *Duncan and Smith v. State*, 281 Md. 247, 378 A.2d 1108 (1977),

where we sustained a warrantless search. There, while those appellants were walking along a road, the police arrested them for theft of goods from a store. The police then drove the appellants in a police car further along the same road, in the same direction in which the appellants had been walking, to a place where there was parked an automobile which the police had related to the theft. The appellants denied any connection with the vehicle. A subsequent, warrantless search by the police of the trunk of the parked car revealed the loot from the theft. Discussing the abandonment aspects of the total circumstances, we said:

" 'Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts.... All relevant circumstances existing at the time of the alleged abandonment should be considered.... Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary.... The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.' "

*Id.* at 265, 378 A.2d at 1119 (quoting *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973)). We further said that "[t]he 'abandonment' of the automobile was no more 'compelled' by the arrests of Duncan and Smith than it would have been 'compelled' by a hot pursuit of them." 281 Md. at 267, 378 A.2d at 1120.

Faulkner's brief undertakes to distinguish *Duncan and Smith.* Following a quotation from *Rakas,* Faulkner gives a *"[c]f."* signal to *Duncan and Smith* with the following parenthetical explanation: "(coerced abandonment under former rule of automatic standing)." Appellant's Reply Brief at 9. The automatic standing discussion in *Duncan and Smith* actually reflects that the decision rests on

grounds of fourth amendment satisfaction.[2] On an earlier appeal to this Court, *Duncan and Smith v. State*, 276 Md. 715, 351 A.2d 144 (1976), the case had been remanded to the Court of Special Appeals to determine whether the search was proper. On the second appeal it was contended that the remand foreclosed adjudicating any preliminary standing question and that the reasonable expectation of privacy issue was exclusively one of standing. 281 Md. at 267, 378 A.2d at 1120. In that context we said:

"It does not follow from the standing of appellants to object to the search and seizure that they must prevail on the merits. They may question whether they abandoned the automobile, but the answer is not preordained by the automatic standing bestowed by *Jones v. United States*, [362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)]. The *Jones* rule of standing was not intended to prevent the State from showing voluntary pre-search abandonment or to apply to a possession prosecution when such abandonment is shown.... Such abandonment by appellants was shown here and, therefore, the search and seizure was reasonable as to them."

281 Md. at 267, 378 A.2d at 1120–21.

Faulkner's attempted distinction of *Duncan and Smith* as a case of "coerced abandonment" has no basis in any portion of this Court's opinion in that case. The attempted distinction is inspired by 4 W.R. LaFave, *Search and Seizure* § 11.3(e), at 333 (2d ed. 1987). There Professor LaFave opines that "[g]iven the fact that one does not otherwise have to incriminate himself to preserve his Fourth Amendment rights, it is difficult to understand how a refusal to make incriminating admissions in response to police interrogation can be held to deprive a person of Fourth Amendment standing." (Footnotes omitted). In support of the LaFave position, Faulkner cites, as does

---

**2.** For purposes of the instant case it is immaterial whether *Duncan and Smith* is exclusively a fourth amendment satisfaction holding or whether that holding is coupled with a lack of standing holding.

LaFave, *State v. Isom*, 196 Mont. 330, 641 P.2d 417 (1982). In that case the court concluded that "the totality of the circumstances suggests that the disclaimer resulted from 'custodial interrogation,'" without any *Miranda* warning having been given. *Id.* at 340, 641 P.2d at 422.

In *Duncan and Smith*, where the denials of ownership were made after arrest, we recognized that all relevant circumstances existing at the time of the alleged abandonment should be considered on the issue of voluntariness and the fact of arrest did not, per se, establish involuntariness. Other cases have recognized oral disclaimers of ownership made to law enforcement authorities as a basis for finding abandonment. *See, e.g., United States v. Brady*, 842 F.2d 1313, 1316 (D.C.Cir.1988) (defendant consented to a search of his train compartment but stated, "I don't know whose bag that is. I never saw it before."); *United States v. Garcia*, 849 F.2d 917 (5th Cir.1988) (denial of checking any baggage with airline); *United States v. Knox*, 839 F.2d 285 (6th Cir.1988) (defendants, detained by DEA agents, denied ownership of travel bag), *cert. denied*, — U.S. —, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989); *United States v. Tolbert*, 692 F.2d 1041 (6th Cir.1982) (defendant denied checking any luggage when apprehended after leaving airport), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983); *State v. Mahone*, 67 Haw. 644, 701 P.2d 171 (1985) (denial of ownership of athletic bag during permissive search of apartment).

In any event, the instant case does not present a vehicle for consideration of the "custodial interrogation" rationale of *State v. Isom, supra.* At the time Faulkner disclaimed ownership of the locker, he was not in police custody.

Nor can Faulkner's initial disclaimer of ownership of the contents of the second locker be viewed as the result of police coercion. The request to open the locker came from Haysbert, who was then exercising a management prerogative. In this case that prerogative was reinforced by management's substantial interest in preventing persons

**452**

who might be under the influence of drugs or alcohol from processing food products intended for human consumption.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.