684 A.2d 823

**Labaron STANBERRY**

**v.**

**STATE of Maryland.**

**No. 107, Sept. Term, 1995.**

Court of Appeals of Maryland.

Nov. 12, 1996.

722

Melissa M. Moore, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Mary Ellen Barbera (J. Joseph Curran, Jr., Atty. Gen., Michelle N. Levister, Asst. Atty. Gen., on brief), Baltimore, for Respondent.

Argued before MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

---

\* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

RAKER, Judge.

We granted Petitioner's request for a writ of certiorari to answer the following question:

Did the lower court err in denying Petitioner's motion to suppress the contents of his suitcase which was left on a Greyhound bus during a twenty-minute stop at the Maryland House and which was searched in Petitioner's absence after police officers held it up and asked the passengers on the bus whether it belonged to them and received no response?

## I.

On August 16, 1993, the Maryland State Police were monitoring Greyhound buses at the Maryland House rest stop on Interstate I–95 as part of a routine drug interdiction investigation. At approximately 8:55 p.m., Petitioner's bus arrived at the rest stop from Newark, New Jersey for a twenty-minute rest stop. Two state troopers, who were in plain clothes and were not displaying weapons, contacted the bus driver and arranged to board the bus and conduct the interdiction procedure once all of the passengers reboarded.[1] At approximately 9:20 p.m., the bus driver counted the passengers and concluded, erroneously, that everyone had returned to the bus. Two of the troopers then boarded the bus, identified themselves, and informed the passengers that they were performing a "drug interdiction." The troopers stated that the purpose of the interdiction was to prevent the flow of drugs into the State, and they requested the cooperation of the passengers. A third trooper remained outside the bus throughout the interdiction.

The two troopers proceeded to opposite ends of the bus and began asking passengers to identify their baggage. In the overhead rack, Trooper Burnette located a black suit bag that was not claimed by any of the passengers seated near it. He

---

1. The troopers did not count the passengers as they disembarked at the rest stop.

continued questioning passengers, and after completing his section of the bus, Trooper Burnette returned to the black bag and again asked the nearby passengers if the bag belonged to any of them. No one claimed the bag. Finally, after all of the other baggage had been claimed, Trooper Burnette took the suit bag to the front of the bus, held the bag overhead, and asked all of the passengers if anyone owned the bag. No one . claimed the bag.

The troopers removed the bag from the bus, opened it, and searched it. The contents included a white shopping bag which contained four smaller plastic bags. One of the smaller bags contained cocaine, and each of the other three bags contained approximately one hundred baggies of heroin. The troopers closed the suit bag, left it beside the bus door, and proceeded to question some of the passengers. The third trooper remained outside the bus to watch the bag.

Petitioner then returned to reboard the bus. The bus driver initially stopped Petitioner from reboarding, but then realized that he had miscounted the number of people on the bus before the interdiction began, and that Petitioner was a passenger. Before Petitioner reboarded, the trooper stationed outside the bus asked him if the black suit bag belonged to him. Petitioner initially claimed ownership of the bag, but immediately contradicted himself and stated that it did not belong to him. Petitioner then told the trooper that he was transporting the drugs to Richmond, Virginia in return for $300. The troopers arrested Petitioner.

Petitioner was indicted by the Grand Jury for Harford County with one count of bringing a controlled dangerous substance into the State, one count of possession of a controlled dangerous substance with the intent to distribute, and one count of possession of a controlled dangerous substance in violation of Maryland Code (1957, 1996 Repl.Vol.) Article 27, §§ 286(a)(1), 286A, and 287(a). Petitioner moved to suppress both the drugs taken from his baggage and his statement to the police. He contended that the police search of his luggage violated his constitutional rights under the Fourth Amend-

ment and that his subsequent statement to the police should be suppressed as "fruit of the poisonous tree" because it resulted from the unlawful search.

At the evidentiary hearing on the motion to suppress, the State contended that the search of Petitioner's bag was permissible because the troopers reasonably believed that the bag was abandoned. The State also maintained that the search was reasonable under the totality of the circumstances.

At the suppression hearing, Petitioner testified that he had not abandoned his bag. He maintained that he had merely left it on the bus for a few minutes while he used the facilities at the rest stop. He testified that he left his bag when he went into the Maryland House but that he did not intend to abandon the bag. Petitioner stated that he intended to and did return to the bus to continue his trip. Petitioner maintained that in order to determine whether property is abandoned for purposes of the Fourth Amendment, the court should consider the subjective intent of the property owner[2] and evaluate whether the owner relinquished any reasonable expectation of privacy in the property. Applying this standard, Petitioner claimed, the property was not abandoned. Petitioner also argued that the troopers' belief that the bag was abandoned was not reasonable.

The circuit court denied the motion to suppress, concluding that although Petitioner did not in fact abandon his suit bag, the troopers reasonably believed that the bag was abandoned. Petitioner then proceeded to trial before the court with an agreed statement of facts in response to the charge of transporting a controlled dangerous substance into the state.[3] The court found Petitioner guilty and sentenced him to fifteen

---

2. We shall use the term "property owner" throughout this discussion to denote the person in possession of the property at the time of the search. As we shall discuss *infra*, however, the property law concept of "ownership" does not determine the extent of Fourth Amendment protection.

3. The State elected not to prosecute Petitioner on the remaining charges.

years imprisonment with all but three years suspended followed by two years of supervised probation.

Petitioner noted a timely appeal to the Court of Special Appeals, presenting the single issue that the trial court erred in denying his motion to suppress. The Court of Special Appeals concluded that the troopers' belief that Petitioner's bag was abandoned was reasonable, and thus the search was lawful. The court stated:

> In the instant case, the bus driver indicated to the officers that all the passengers had reboarded the bus. It was not until then that the officers began the interdiction process. Upon finding the bag and prior to opening it, the officers repeatedly inquired as to which of the passengers it might belong. These inquiries went unanswered. In [the troopers'] objective opinion, because they believed all the passengers that might have claimed ownership of the bag were present on the bus, they believed the bag had been abandoned. The trial court did not clearly err in stating that, although actual abandonment had not occurred, the officers, based on their knowledge and experience, acted reasonably in presuming the bag had been abandoned, based generally and on their knowledge at the specific time of the search. Moreover, "[t]o suppress the evidence in the face of such subdued official conduct would render all such interdiction programs suspect...." *U.S. v. Flowers,* 912 F.2d 707 at 712 (4th Cir.1990).

On the facts presented by this case, the officers' reasonable and objective basis for concluding that the bag had been abandoned was "much more than a calculated guess and cannot be described as an effort to conduct a fishing expedition.... The extreme sanction of exclusion would be inappropriate...." *U.S. v. Owens,* 848 F.2d 462 at 466 (4th Cir.1988). That is not to say, however, that searches of this type will not be invalidated. While close scrutiny of interdiction claims of "reasonableness" is required by the Fourth Amendment to guard against contrived situations, our independent examination of the facts here present leads us to conclude, as did the trial court, that the officers acted

reasonably. There may be many interdiction situations in which the intrusion on Fourth Amendment protections will be unreasonable. This, however, is not such a case.

*Stanberry v. State,* 105 Md.App. 200, 214–15, 659 A.2d 333, 340–41 (1995). We granted Petitioner's request for a writ of certiorari.

## II.

In this case, we must consider the constitutionality of a search for narcotics conducted on a bus during a "drug interdiction." This is a matter of first impression in Maryland. Drug interdictions have become a widely used tool in fighting the "war on drugs." As the Supreme Court explained in *Florida v. Bostick,* 501 U.S. 429, 431, 111 S.Ct. 2382, 2384, 115 L.Ed.2d 389 (1991):

> Drug interdiction efforts have led to the use of police surveillance at airports, train stations, and bus depots. Law enforcement officers stationed at such locations routinely approach individuals, either randomly or because they suspect in some vague way that the individuals may be engaged in criminal activity, and ask them potentially incriminating questions.

The police have developed varying methods of conducting drug interdictions. S. Guerra, *Domestic Drug Interdiction Operations: Finding the Balance,* 82 J.Crim. L. 1109, 1127–28 (1992).[4]

---

**4.** Professor Guerra describes three basic methods of conducting drug interdictions:

> The typical method used in sweeping buses involves the officers' boarding the bus and questioning everyone, requesting consent to search from some. The agents usually proceed to the back of the bus and work their way forward. The agents identify themselves and sometimes explain that they are seeking the public's cooperation in their drug interdiction efforts. In some cases, officers request a passenger's consent to answer some questions, but in most cases, they simply proceed to pose questions. The officers ask the passenger's name and itinerary, and then request to see identification and bus tickets. Officers then often request consent to search the passen-

Numerous courts have considered the constitutionality of searches and seizures conducted during drug interdiction investigations. *See, e.g., Bostick,* 501 U.S. 429, 111 S.Ct. 2382; *United States v. Flowers,* 912 F.2d 707 (4th Cir.1990), *cert. denied,* 501 U.S. 1253, 111 S.Ct. 2895, 115 L.Ed.2d 1060 (1991); *United States v. Garcia,* 909 F.Supp. 334, (D.Md.1995). The Supreme Court addressed the constitutionality of a drug interdiction in *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389. In *Bostick,* the Court considered whether a defendant questioned by police in the course of a drug interdiction on a bus had been illegally seized in violation of the Fourth Amendment. *Id.* Rejecting the Florida Supreme Court's *per se* rule barring drug interdictions on buses, *see Bostick v. Florida,* 554 So.2d 1153 (Fla.1989), *rev'd,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the United States Supreme Court reasoned that:

> [E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the

ger's person or belongings. In some cases, officers advise a person that consent to search may be refused.

Alternatively, officers may sweep a bus by asking passengers to identify their luggage on the overhead racks or beneath the seats. If a particular piece of luggage goes unclaimed, the officers will inquire of the person sitting closest to it, and then of all the passengers, to determine its owner. If no one claims possession of it and if all the passengers are on board, the officers will then proceed to search the "abandoned" luggage. They often discover evidence that one of the nearby passengers owns the piece of luggage and, presumably, whatever contraband may be found inside.

In some other cases, officers board a bus and randomly select a few passengers to interview and from whom to request identification and bus tickets. In one reported case, the officers admittedly boarded the bus and then selected suspicious people or people who were "unduly nervous," obviously based only on their appearance and demeanor, and investigated only those people. These interviews invariably culminate in a request to search either the person or the passenger's belongings. In these cases, too, passengers often disclaim ownership of their baggage.

*Guerra, supra,* at 1127–28.

police do not convey a message that compliance with their requests is required.

*Bostick,* 501 U.S. at 434–35, 111 S.Ct. at 2386 (citations omitted). Although the Court remanded the case for a determination of whether, on the particular facts of the case, Bostick was seized, the Court rejected the view of the Florida Supreme Court that any drug interdiction conducted on a bus resulted in an unconstitutional seizure of the passengers. *Id.* at 437, 439–40, 111 S.Ct. at 2387–88, 2389.

Although the Court concluded in *Bostick* that bus drug interdictions are not *per se* unconstitutional, the Court further explained that if the police indicate that compliance with their requests is required "by means of physical force or show of authority," then the encounter may amount to an unlawful seizure of the person. *Id.* at 434, 111 S.Ct. at 2386. Thus, the applicability and extent of Fourth Amendment protections depend on the specific procedures used by the police. *See, e.g., United States v. Fields,* 909 F.2d 470 (11th Cir.1990); *United States v. Tartaglia,* 864 F.2d 837 (D.C.Cir.1989); *United States v. Whitehead,* 849 F.2d 849 (4th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); *State v. Henderson,* 114 Idaho 293, 756 P.2d 1057 (1988).

In the instant case, the drug interdiction search led police to conclude that a piece of baggage was abandoned, resulting in a warrantless search of the bag containing narcotics. Petitioner acknowledges that abandoned property is not protected by the Fourth Amendment, but he maintains that the property at issue in this case, his black suit bag, was not abandoned. Petitioner contends that he did not intend to abandon his property, and furthermore, that he did nothing to manifest any intent to abandon his bag. Thus, he asserts that the warrantless search of his bag was impermissible. The State responds that even if the police mistakenly believe that property is abandoned, their search of the property does not violate the Fourth Amendment provided they reasonably believe the property is abandoned. In this case, the State maintains that Petitioner's bag appeared to be abandoned, and therefore the search did not violate the Fourth Amendment.

Finally, the State advocates extending the "good faith" doctrine of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), to this warrantless search.

## III.

■ The Fourth Amendment provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST., amend. IV. The scope of the protection afforded by the Fourth Amendment is defined in terms of the individual's "legitimate expectation of privacy." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *Owens v. State*, 322 Md. 616, 625, 589 A.2d 59, 63, *cert. denied*, 502 U.S. 973, 112 S.Ct. 452, 116 L.Ed.2d 470 (1991).

■ Fourth Amendment protection, however, does not extend to property that is abandoned. *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *Morton v. State*, 284 Md. 526, 531, 397 A.2d 1385, 1388 (1979); *Everhart v. State*, 274 Md. 459, 483, 337 A.2d 100, 114 (1975). By abandoning property, the owner relinquishes the legitimate expectation of privacy that triggers Fourth Amendment protection. *Venner v. State*, 279 Md. 47, 59, 367 A.2d 949, 956, *cert. denied*, 431 U.S. 932, 97 S.Ct. 2638, 53 L.Ed.2d 248 (1977). We have previously articulated a two-part test to determine when Fourth Amendment protection applies:

[F]irst ... a person [must] have exhibited an actual (subjective) expectation of privacy and, second, that ... expectation [must] be one that society is prepared to recognize as 'reasonable.'

*Venner*, 279 Md. at 52, 367 A.2d at 952 (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d

576 (1967) (Harlan, J., concurring)); *see also California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988). We have also noted, in accord with a number of other courts and commentators, that the test for whether property is abandoned for purposes of the Fourth Amendment differs from the property law concept of abandonment.[5] *Owens*, 322 Md. at 625, 589 A.2d at 63; *Venner*, 279 Md. at 53, 367 A.2d at 952.

Although the Fourth Amendment abandonment inquiry focuses on the property owner's actual expectation of privacy, a subjective question, courts must frequently rely on objective indications of the owner's intent. As Chief Judge Murphy wrote for this Court in *Morton v. State*, 284 Md. at 531, 397 A.2d at 1388–89:

Whether property has been "abandoned is generally a question of fact based upon evidence of a combination of act and intent." Intention is a prime factor in considering whether there has been an abandonment; it is to be ascertained from what the actor said and did since intent, al-

---

**5.** For example, in *Venner*, we quoted *United States v. Wilson*, 472 F.2d 901, 902 (9th Cir.1972), *cert. denied*, 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973), for the proposition that:

"The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned."

*Venner*, 279 Md. at 53, 367 A.2d at 952; *see also United States v. Barlow*, 17 F.3d 85, 88 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 148, 130 L.Ed.2d 88 (1994); *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C.Cir.1990); *United States v. Oswald*, 783 F.2d 663, 666 (6th Cir.1986); 1 W. LaFave, Search and Seizure, § 2.6(b), at 464 (2d ed. 1987 & 1995 Supp.); C. Steiker, *Second Thoughts About First Principles*, 107 Harv. L. Rev. 820, 827–28 (1994); Note, *From* Katz *to* Greenwood: *Abandonment Gets Recycled from the Trash Pile—Can Our Garbage Be Saved from the Court's Rummaging Hands?*, 41 Case W. Res. L. Rev. 581, 589–92 (1991). *Cf. Katz v. United States*, 389 U.S. 347, 352–53, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967) ("[A]t one time . . . [the Fourth] Amendment was thought to limit only searches and seizures of tangible property. But '[t]he premise that property interest control the right of the Government to search and seize has been discredited.'") (quoting *Warden v. Hayden*, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967)) (alteration in original) (footnote omitted).

though subjective, is determined from objective facts at hand.

(citations omitted). *See also Duncan and Smith v. State,* 281 Md. 247, 262, 378 A.2d 1108, 1118 (1977); *Everhart v. State,* 274 Md. 459, 483, 337 A.2d 100, 114 (1975); *United States v. Rem,* 984 F.2d 806, 810 & n. 2 (7th Cir.), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993).

■ We have analyzed a variety of objective factors to determine whether property is abandoned. Among other considerations, we have evaluated the location of the property and assessed whether the area is secured. *Owens,* 322 Md. at 630–31, 589 A.2d at 66; *see also United States v. Most,* 876 F.2d 191, 196–97 (D.C.Cir.1989); *United States v. Oswald,* 783 F.2d 663, 666–67 (6th Cir.1986). We have also assessed how long the property remained in the location prior to the search and the condition of the property at the time of the search. *Morton,* 284 Md. at 534, 397 A.2d at 1390; *Duncan and Smith,* 281 Md. at 263–64, 378 A.2d at 1118–19. In addition, we have considered whether the owner requested a third party to watch or protect the property. *Owens,* 322 Md. at 630, 589 A.2d at 65–66. Finally, we have considered whether the owner disclaimed or failed to claim the property when questioned by police. *Faulkner v. State,* 317 Md. 441, 451, 564 A.2d 785, 789–90 (1989); *Morton,* 284 Md. at 534, 397 A.2d at 1390.[6]

---

**6.** The police frequently rely on the owner's disclaimer of ownership to indicate abandonment. *See, e.g., United States v. Lewis,* 921 F.2d 1294, 1303 (D.C.Cir.1990); *United States v. Lee,* 916 F.2d 814, 818 (2d Cir.1990); *United States v. Tolbert,* 692 F.2d 1041, 1044–45 (6th Cir. 1982), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983); *United States v. Garcia,* 909 F.Supp. 334, 339 (D.Md.1995). Disclaimers of ownership are particularly important in the drug interdiction context, because drug interdiction procedures frequently involve asking passengers to identify their baggage. *See Guerra, supra,* at 1128.

Like consent, however, a disclaimer of ownership must be voluntary to be effective. *See McMillian v. State,* 325 Md. 272, 284–85, 600 A.2d 430, 436 (1992). Therefore, a disclaimer of ownership does not support a finding of abandonment when the disclaimer results from illegal police conduct. *Duncan and Smith,* 281 Md. at 263, 378 A.2d at 1118; *United States v. Ward,* 961 F.2d 1526, 1535 (10th Cir.1992).

 Applying these general principles of Fourth Amendment jurisprudence to cases involving luggage, we note first that the Supreme Court has recognized that an individual possesses a legitimate expectation of privacy in the contents of his or her luggage. *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983); *Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979) ("[L]uggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy."). In addition, because the operative issue, for Fourth Amendment purposes, is whether the property owner relinquished any reasonable expectation of privacy in the property, briefly relinquishing control of the property, *e.g.*, by checking baggage, does not always amount to abandonment.[7] *See Morton*, 284 Md. at 533, 397 A.2d at 1389–90; *cf. Venner*, 279 Md. at 51, 367 A.2d at 952.

Moreover, courts have found that temporarily leaving luggage in a secured area does not indicate abandonment. *United States v. Lee*, 916 F.2d 814, 818 (2d Cir.1990); *see also Most*, 876 F.2d at 198–99 (leaving shopping bag with store clerk, as required by store policy, does not constitute abandonment). For example, the United States Court of Appeals for the Second Circuit stated that:

> When checked luggage is left for a short period in the custody of an airline, it is presumed that the luggage is stored in a secure area and is safeguarded against intrusion. Thus, the luggage owner's expectation of privacy remains undiminished, even though he fails to promptly retrieve his bag. However, this presumption can certainly be overcome

---

7. Professor LaFave also observes that:

It should not be assumed ... that in every instance in which a defendant relinquishes possession or control, albeit briefly, an abandonment for Fourth Amendment purposes has occurred. *The fundamental question is whether the relinquishment occurred under circumstances which indicate he retained no justified expectation of privacy in the object.*

1 LaFave, *supra*, § 2.6(b), at 467 (emphasis added).

when other objective facts demonstrate the owner's intention to abandon his property.

*Lee*, 916 F.2d at 818 (citations omitted). Thus, "[f]ailure to retrieve a checked suitcase from a baggage claims area does not automatically constitute abandonment." *United States v. Rem*, 984 F.2d 806, 811 (7th Cir.1993); *see also United States v. Tolbert*, 692 F.2d 1041 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983).

As Chief Judge Wald observed, writing for the United States Court of Appeals for the District of Columbia Circuit:

[A]n individual need not shut himself off from the world in order to retain his fourth amendment rights.

\* \* \* \* \* \*

When an individual, by abandoning his property, leaves it within the reach of the public generally, there would be little point in requiring that the police alone be excluded. Such a rule would impede effective law enforcement while adding little to the individual's interest in privacy. It is quite another matter, however, to suggest that an individual forfeits his expectation of privacy simply by entrusting his possessions to one other person. . . . In a variety of circumstances, we are all forced to surrender our possessions temporarily to the custody of others. We leave our bags with clerks at stores, museums, and restaurants; we check our luggage when we travel by train or by air; we park our cars at commercial garages. The suggestion that police in these situations may conduct warrantless searches of our belongings finds no support in precedent or in logic.

*Most*, 876 F.2d at 198 (footnotes omitted) (citations omitted).

Although courts should generally consider all relevant facts in assessing whether property was abandoned, we believe that the Supreme Court's decision in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), as discussed above, precludes the courts, or the police, from inferring abandonment from the owner's failure to assert ownership of luggage in response to police questioning during a drug interdiction. An affirmative disclaimer of ownership is markedly

different from passive failure to claim one's property. *United States v. Rush,* 890 F.2d 45, 48 (7th Cir.1989); *United States v. Hawkins,* 681 F.2d 1343, 1346–47 (11th Cir.1982); *United States v. Sanders,* 719 F.2d 882, 885–86 (6th Cir.1983); *State v. Joyner,* 66 Haw. 543, 669 P.2d 152, 153 (1983); *State v. May,* 608 A.2d 772, 776 (Me.1992) ("Although a number of courts have held that abandonment may arise out of an express disclaimer of ownership ..., abandonment cannot be similarly inferred from mere silence in response to police questioning."); *cf. United States v. Salinas–Cano,* 959 F.2d 861, 864 (10th Cir.1992) (in assessing whether third party validly consented to search defendant's property, "[c]ourts consider ... whether the consenter explicitly disclaimed ownership or whether the defendant was present but did not claim ownership").

*Bostick* requires that "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." 501 U.S. at 436, 111 S.Ct. at 2387. The Supreme Court further explained: "We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Id.* at 437, 111 S.Ct. at 2387. To construe a refusal to cooperate with the police conducting a drug interdiction as an indication that property is abandoned, thereby justifying a warrantless search or seizure, would contradict the holding of *Bostick.*

In *Commonwealth v. Holloway,* 9 Va.App. 11, 384 S.E.2d 99 (1989), the Virginia Court of Appeals considered the issue of whether, in light of *Bostick,* failure to assert ownership in response to police questioning may be interpreted to indicate abandonment. The court reasoned that:

The defendant's failure to respond to the agent's inquiry concerning ownership of the luggage need not be interpreted as abandonment. Having been advised by the agent that he was investigating for illegal drugs on board the train, the defendant, whose assertion of ownership may have been incriminating, chose to remain silent in the face of police questioning. He had a right to remain silent. *Florida v.*

*Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). The failure of other passengers in the vicinity to claim ownership is not evidence of the defendant's abandonment of ownership nor is it evidence that the true owner had abandoned the luggage. The luggage was in a proper place for storage, and the owner may not have chosen to answer or been available when the agent inquired of passengers in the vicinity.

*Holloway,* 384 S.E.2d at 104. The appellate court determined that the trial court was not clearly erroneous in concluding that the defendant's luggage was not abandoned. *Id.*

In sum, we conclude that in determining whether property is abandoned, the Fourth Amendment requires that we consider whether the owner has relinquished any reasonable expectation of privacy in the property. While the owner's intent to abandon the property may be relevant in determining whether the owner had a reasonable expectation of privacy, subjective intent alone is not dispositive. *See United States v. Thomas,* 864 F.2d 843, 846–47 & n. 5 (D.C.Cir.1989); *see also* 1 LaFave, *supra,* § 2.6, at 111 n. 48 (1995 Supp.). Intent to abandon must ordinarily be assessed based on external manifestations, such as the owner's words and actions. *Duncan and Smith,* 281 Md. at 264–66, 378 A.2d at 1119–20. An owner's affirmative disclaimer of ownership, if voluntary, ordinarily constitutes abandonment. But when police are conducting a drug interdiction, when the interdiction protocol is the sole basis for the citizen inquiry and reasonable suspicion or probable cause is otherwise lacking, police may not infer abandonment from the owner's passive failure to claim property.

## IV.

Applying the factors outlined above to the present case, we note at the outset that the police entered the bus without articulable suspicion or probable cause, and they subsequently searched Petitioner's luggage without a warrant. Under the circumstances of this case, we conclude that the objective

manifestations of Petitioner's intent did not support the troopers' conclusion that Petitioner's bag was abandoned.

▇▇▇▇ We first observe that Petitioner possessed a legitimate expectation of privacy in his baggage. In addition, although Petitioner may have reduced his expectation of privacy by placing his bag on the overhead luggage rack, Petitioner did not surrender his expectation of privacy merely by placing his bag where it was accessible to other passengers. Nor did Petitioner forego his expectation of privacy by leaving the bag on the bus when he disembarked at the rest stop. The area was to some extent secure, because no one could board the bus without the permission of the driver. Petitioner did not ask another passenger to watch the bag or otherwise give control of his property to anyone else. Petitioner merely left his bag on the bus for a brief period while he used the facilities at a scheduled rest stop.

Moreover, recognition of Petitioner's subjective expectation of privacy in his luggage is reasonable. *See Morton*, 284 Md. at 534, 397 A.2d at 1390. As the United States Court of Appeals for the District of Columbia stated, "[t]he law obviously does not insist that a person assertively clutch an object in order to retain the protection of the fourth amendment." *United States v. Thomas*, 864 F.2d 843, 846 (D.C.Cir.1989).

Because we conclude that Petitioner possessed a reasonable expectation of privacy in his luggage, triggering Fourth Amendment protection, we must next consider whether the police could reasonably have concluded that Petitioner's bag was abandoned. As stated in Section III, we shall consider not only Petitioner's subjective intent, but also whether, under the circumstances of this case, the troopers could legitimately have inferred from objective indications that Petitioner's bag was abandoned.

The record indicates that the police concluded that the bag was abandoned because no one claimed it in response to their questioning. This is reflected by the following exchange during the State's direct examination of Trooper Burnette at the suppression hearing:

[STATE'S ATTORNEY]: Now with regard to—and I am asking for your knowledge, your thought processes—what made you believe that the overhead suit bag was abandoned at the time that you describe that it was?

[TROOPER]: Nobody claimed it as being theirs, after several announcements. And it's been my experience that when a bag is not claimed that there [are] ... possibly illegal substances in the bag.

■ We conclude that, under the totality of the circumstances, the troopers should not have inferred abandonment from the passengers' silence. As we stated above, in accord with the Supreme Court mandate in *Florida v. Bostick,* in order for the drug interdiction search to meet constitutional requirements, a passenger must feel free to refuse to comply with police requests, to remain silent in response to police questions, and to leave the bus if desired.[8]

---

**8.** The record reflects that the police were aware of the principles articulated in *Bostick* governing the administration of drug interdictions. For example, on cross-examination of Trooper Burnette, the following exchange occurred:

> [DEFENSE COUNSEL]: Trooper, [the State's Attorney] ... asked you whether during the course of your interdiction where you are going down the aisle, are passengers restrained from leaving the bus ... [a]nd I think you indicated they are not?
> [TROOPER]: That's correct.
> [DEFENSE COUNSEL]: I guess the purpose—is it fair to say that the purpose is to put the people at ease?
> [TROOPER]: Yes.
> [DEFENSE COUNSEL]: To make the whole episode as convenient as possible?
> [TROOPER]: Right. We try not to pressure anyone or show any authority. They know we are the police, but we don't wear uniforms. We try to make them as comfortable as possible. We don't want any indication or don't want anyone to think they are scared or coerced into cooperating with us.
> [DEFENSE COUNSEL]: And you say they frequently do smoke a cigarette or whatever—step off of the bus?
> [TROOPER]: Yes, they do.
>
> * * * * * *
>
> [DEFENSE COUNSEL]: As you are conducting your interdiction process, how did you keep track of passengers going on and off of the bus to have a cigarette?

In sum, under these circumstances, it was not reasonable to conclude that the luggage was abandoned. Hence, the Fourth Amendment applied to the drug interdiction search. As previously stated, subject to a few well-delineated exceptions, warrantless searches are *per se* unreasonable. *McMillian v. State*, 325 Md. 272, 281, 600 A.2d 430, 434 (1992); *Ricks v. State*, 322 Md. 183, 188, 586 A.2d 740, 743 (1991). In this case, the State failed to establish that any recognized exception to the warrant requirement applied.[9]

The State, relying on a theory of "apparent abandonment," argues by analogy to *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), that the search should be upheld because the troopers reasonably relied on objective facts indicating that the luggage was abandoned, although it was not in fact abandoned. In *Rodriguez*, the police conducted a warrantless search of the defendant's apartment, relying on the defendant's girlfriend's apparent authority to consent to the search. *Id.* at 179–80, 110 S.Ct. at 2797. Although the police subsequently learned that the girlfriend lacked actual authority to consent, the Supreme Court held that if the police acted "reasonably" in light of the objective indications that the

---

[TROOPER]: We don't really try to keep track of them. If one gets off we may observe them get off of the bus. We don't really keep track.

\* \* \* \* \* \*

[DEFENSE COUNSEL]: Now is it also possible that one of them could be off the bus smoking a cigarette or have returned to the Maryland House for some purpose when a bag is identified?
[TROOPER]: Not in my experience. Usually once we have [passed] ... an area—I never had one get off of the bus before they had acknowledged that was a bag they had.
[DEFENSE COUNSEL]: But you said you wouldn't stop them?
[TROOPER]: No, I wouldn't.

**9.** Although Petitioner initially claimed ownership of the bag, then immediately disclaimed ownership of his bag, the disclaimer did not occur until after the troopers had searched his bag. Under these circumstances, this after-the-fact disclaimer may not be used as a *post hoc* justification for an otherwise unconstitutional search. *Robles v. State*, 510 N.E.2d 660, 663 (Ind.1987), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2872, 101 L.Ed.2d 907 (1988); *Franklin v. State*, 913 S.W.2d 234, 240 (Tex.Ct.App.1995).

girlfriend possessed common authority over the premises, then the search was not unconstitutional. *Id.* at 182–89, 110 S.Ct. at 2789–2802. Our result is consistent with *Rodriguez.* As we have explained, in light of *Bostick,* the troopers in this case could not reasonably have concluded that the bag was abandoned from the mere fact that the passengers were silent when asked if anyone owned the bag.

The State argues that we should extend the "good faith" doctrine articulated in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), to warrantless searches, thereby precluding application of the exclusionary rule where the police act in good faith. The record reflects that the police were clearly aware of the passengers' right to remain silent or to leave the bus during the interdiction. Therefore, we need not reach this issue because we conclude that the police could not, in good faith, have inferred abandonment from the passengers' silence.

For the foregoing reasons, we conclude that the trial court erred in denying Petitioner's motion to suppress the drugs. In addition, Petitioner's subsequent statement to the troopers should have been suppressed as fruit of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963); *Gadson v. State,* 341 Md. 1, 8–9, 668 A.2d 22, 26 (1995).

We recognize the gravity of the drug problem and acknowledge the need for investigatory techniques that respond to the increasingly sophisticated methods employed by drug traffickers. As Justice Powell wrote in *United States v. Mendenhall,* 446 U.S. 544, 561–62, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980) (Powell, J. concurring):

> The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many

drugs ... may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement.

We note, moreover, that not every encounter between police and private citizens during drug interdictions triggers Fourth Amendment scrutiny. As the Supreme Court stated in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983):

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.

*Id.* at 497, 103 S.Ct. at 1324 (citations omitted); *see also Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877–78 (person is not seized where plainclothes agents asked for identification and ticket, and she agreed to cooperate, even if agents did not expressly tell respondent she was free not to cooperate). Thus, police may approach private citizens and ask questions or ask for identification without individualized suspicion or probable cause, provided the encounter is consensual. Furthermore, if, as a result of these inquiries, police ask for and receive voluntary consent to search a citizen or his possessions, the Fourth Amendment does not apply. *Mendenhall*, 446 U.S. at 559, 100 S.Ct. at 1879–80. Although the facts of the drug interdiction search at issue in this case render it unlawful, many drug interdictions may be conducted without violating the Fourth Amendment. *See Guerra, supra.*

Moreover, although we find today that, under the circumstances presented in the instant case, the police search of Petitioner's luggage was unlawful, we stress that our holding is limited to the conduct of the police when they are acting in

their criminal investigatory capacity. As the Iowa Supreme Court stated in discussing the rationale for the emergency-aid exception to the warrant requirement:

> In essence police officers function in one of two roles: (1) apprehension of criminals (investigative function); and (2) protecting the public and rescuing those in distress (caretaking function). Courts have noted that preservation of human life is paramount to the right of privacy protected by the fourth amendment. Thus the emergency-aid exception is justified because the motivation for the intrusion is to preserve life rather than to search for evidence to be used in a criminal investigation.

*State v. Carlson* 548 N.W.2d 138, 141 (Iowa 1996) (citations omitted). Our holding does not apply to situations in which the police are acting to protect public safety pursuant to their community caretaking function, *e.g.*, by attempting to identify a package that might contain a bomb. *See Gadson,* 341 Md. at 17–18, 668 A.2d at 30–31. Although there are situations in which an unclaimed package or piece of luggage may arouse suspicions of an explosive, in the case before us, the police relied solely on the drug interdiction protocol and articulated no suspicion or belief that the luggage might contain an explosive.

Where the police act in their investigative capacity, their actions must comply with the requirements of the Fourth Amendment. As the Supreme Court stated in *Bostick:*

> This Court . . . is not empowered to suspend constitutional guarantees so that the Government may more effectively wage a "war on drugs." If that war is to be fought, those who fight it must respect the rights of individuals, whether or not those individuals are suspected of having committed a crime.

501 U.S. at 439, 111 S.Ct. at 2389 (citations omitted).

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR HARFORD COUN-*

744

*TY FOR A NEW TRIAL. COSTS TO BE PAID BY HAR-
FORD COUNTY.*